The next case on our calendar is United States versus City of New York. United States, that's Ralph Gelbman, number 18-3162. Thank you. Good morning, Your Honors. Brian Isaac, I represent the appellant in this matter. Seated to my left is Richard Ankowitz. He's the attorney of record for the plaintiff, and he's here to observe and help me if I need some help. Before I start with my argument, I'd just like to tell you a little bit about the limited nature of the request for relief that we're making. We're not suggesting that plaintiff has a slam-dunk good case. We're not suggesting to the plaintiff that the relator has a slam-dunk bad case. What we're saying is that in a 12b6 motion, even with the specificity requirements set forth in 9b, we have enough here on this record to warrant a denial of a 12b6 motion to dismiss where there's been no discovery whatsoever. And many of these cases get dismissed because there isn't the particularity required by the courts. However, we're in a little bit of a different situation here because the relator himself has personal knowledge of conversations that went forth in what was referred to as, quote, evolution project meetings, in which there was a kind of tacit agreement between the City and the Department of Health to allow these claims to go through in the City of New York. Actually, maybe you could expand on that a little bit. It was not clear to me how your client was alleging that the City and the Health and Hospitals Corporation was itself involved in the submission of the Medicaid claims to the Federal Government. It looked like the State was running that. Verrilli, yes. So let me deal with that, if I can, Judge Carney, factually and legally as well. Okay. The case I would like you to rely on dealing with the submission of the so-called CMS-64 form, it's on page 60 and 65, is obviously the Feldman decision. It's a lower court decision by Judge Rakoff, where Judge Rakoff, citing to decisional law from other circuits, specifically takes the position that even where another party sets forth the information, if the original information is contained in submissions made by the party against whom liability is sought, that's sufficient. So that was the legal rationale there. But it still looked to me as though it was possible that it wasn't submitted in the earlier, in the first format, that duplicates could have been screened out, that non-eligible providers could have been identified, that all kinds of things would happen. And so I didn't see exactly how the City itself was involved in the submission in a meaningful. Let me explain it, and then let me also cite to your decision in Schwartz's, if I can. Here's the way that the claims get processed in the City. As you know, there are these local districts via the social service law that deal with Medicaid cases generally within New York. In New York City, because we have so many people on Medicaid, we have a different system. HRA, it's a city agency, is the agency that processes all claims. They process claims not just for health and hospital, not for related companies, but even for private physicians. Those go through a system called eMEDNY, E-Med-NY, which you obviously all read. And then that system itself leaves out edit codes, and edit codes are essentially codes that set forth potential problems with the claim. They can be paid. They can be paid. Kagan. I read that, but I would expect your client, having worked for the State, would know exactly kind of what was submitted by the State ultimately, and the defendants here are the City. Right. But the City is the one that's giving the – the City is the one that's providing the forms to the State, and the State's just then forwarding them forward. I'm not suggesting that the State – Unlike Georges, where there were direct – there were directions to falsify the records that were submitted to Medicaid for payment, and there were very detailed allegations about those instructions to falsify, there seems to be a large gap here between the initial submissions and the ultimate request for payment. I would suggest to you that if you look at the allegations in the complaint, I think it's 90-104, dealing specifically with the Evolution meetings, the gap is filled in because my client is not employed by the City. Obviously, he's employed by the DOH. But he talks about situations where there are actual conversations. He's not a higher-level employee. He's kind of a lower-level employee, where this is discussed, and there's a discussion between high-level City employees and high-level State employees to process these cases that we've identified. These claims may not be eligible for payment at all. So we – and I would also point out to you that with respect to the possibility that those claims could have been properly paid, this is what you said in Georges. The fact that it could have been doesn't mean that it is. And I'm quoting directly. This is 865F3rd at 85. Quote, So I'm not suggesting to you that even the decision that was made here in 865F3rd for runs that were billed to payors other than Medicare, billed for a denial or not billed at all, any such conclusory defense of the underlying scheme is not persuasive at the pleading stage, which is exactly where we are here. So I'm not suggesting to you that even the decision that was made here in 865F3rd doesn't have some rationality to it. Look, I believe that health care is a fundamental right. Nobody agrees with me, but we shouldn't have people decomposing on our streets. I work three minutes from here. But it's not okay to process claims that might not be processable in terms of paying them merely to perpetuate a system that's working for other people. That's what the CITEM claim is designed to avoid. And I would point out to you that the city in its brief says, and I quote, this is on page 11. A claim is false or fraudulent if it is, quote, an improper claim aimed at extracting money the government otherwise would not have paid. Question and citing to your decision in Mikes, isn't this a situation where the Federal government, who's paying 50 percent generally, is paying 50 percent of the Medicaid benefits, 25 state, 25 city, shouldn't they at least be told about that? To me, this is a situation covered directly by the Supreme Court's decision in the Escobar case, which says in the second paragraph, and I'm quoting, specifically liability can attach when a defendant submits a claim for payment that makes specific representations about the goods and services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement. Kagan. And doesn't that comment get refined to focus on material violations and not just any violation? And that, therefore, a course of conduct in which the government accepts and pays on certain claims may suggest that it waives some, it doesn't waive others. You need more than that. I thought that what the Justice wrote in Escobar was more nuanced than what you suggest. I'm not suggesting it isn't. All I'm suggesting is at the pleading stage, we're not talking about, you know, $10,000 or $100,000 or even $10 million. We're talking about hundreds of millions if not billions of dollars. The notion that the notion that billions of dollars in claims were ministerial defects that were corrected doesn't seem to me to be correct as just a matter of common sense. And we did, and I won't go over my time. We did lay out in the exemplar portion of the complaint the claims, the dates, the amounts to the penny based on EMDNY downloads that were taken directly from the website. This is not a case where we're dealing with generalities. We're dealing with enough specifics to provide a pleading, to avoid a pleading level dismissal at this point. Kagan. Did the exemplars show how much was actually paid on those exemplars? There is, yes. You have form D, it's form C, D, and E. It's attached after page 65. And if you look in the complaint, the complaint breaks it down by time to the penny. We're not talking approximations to the penny. Thank you, Your Honor. The city has to say. Good morning. My name is Joseph Willey. I represent the City of New York and New York City Health and Hospitals Corporation. The crux of the relator's second amended complaint here is really that the New York State Department of Health, which is the relator's employer, the state Medicaid agency, which is not a defendant here, paid Medicaid claims submitted by health care providers in the city of New York that were not eligible for payment because the state had assigned certain edit codes to those claims at some point in time, making them, according to the relator, ineligible for payment. These are edit codes that indicate a claim is untimely, lack of prior approval, that sort of error. Now, the district court found that the complaint failed to meet the pleading standards of under Rule 12b-6 and 9b because the complaint does not allege plausible facts creating a strong inference that false claims were submitted. An edit code in itself, without more, does not mean that the claim was not payable or will not become payable, and certainly does not mean that a claim submitted by a provider was false. The state applies edit codes to a claim to communicate certain information to the provider, which might include to flag an error that can result in the denial or pending of a payment. Providers can sometimes address the error, and if it is an error, and resubmit the claim. The complaint does not allege that the provider did not correct or otherwise address the alleged error. In fact, the complaint does not specify anything about the chronology of the application of edit codes on claims, particularly whether the edit was resolved and still on the claim at the time the State Department of Health paid the claim. But what about the exemplars? The exemplars, as I said, they indicate or they allege that there were edit codes assigned to the claim at some point in time, but the exemplars do not explain the chronology. Was the edit code applied initially on submission of the claim and then resolved by the provider and resubmitted? There's no allegation surrounding that. And as, you know, this Court's prior decision in the L7 Old Navy case, you know, what goes to the plausibility of a strong inference of fraud includes whether there are alternative explanations that are not considered or not alleged. For example, as to the untimely claims, there were exemplar claims indicating that a code was assigned saying it was not a timely submission. What timeliness can be waived? What about duplicate claims? Well, it could be an error. You know, there are no allegations that the city and the state agreed that actually false claims or incorrectly paid claims should be submitted, should be paid, and that the state should then claim federal Medicaid matching funds for that expenditure. Isn't that the nature of the complaint, the relator's allegations about the evolution meeting, so-called? Yes, there were vague references to things that the city said about, you know, denying payment on claims would financially harm the city or providers in the city of New York. But there are no specific allegations that the, as to what any, you know, any statements made by a city employee, that the city employee encouraged the state to commit fraud, to pay claims that were not entitled to be paid, and then to claim federal Medicaid matching funds. It's important to keep in mind here that the way the state Medicaid program works is the, there's a federal statute that applies to the state. The state has to pay providers in accordance with state law, and if the state makes a payment that is entitled to federal Medicaid matching funds, the state can claim FFP, or federal financial participation, for that state expenditure. Now, the complaint alleges that the State Department of Health knowingly paid the providers' claims that were not entitled to payment because of the existence of the edit code. That's the allegation, that the state agreed to do that, or, you know, determined that it would do that, notwithstanding the edit. If that was incorrect, then it's up to the state to decide whether it can now claim federal Medicaid matching funds for that expenditure to a provider. There are no allegations that the city of New York, or the Health and Hospitals Corporation, which, by the way, Health and Hospitals Corporation is not alleged to have even been present at these evolution project meetings. But there are no allegations that the city or Health and Hospitals Corporation caused the state to submit a false claim to the federal government for FFP. There's no allegation whatsoever that they had any discussion about that. And given that the allegation is that the state knowingly paid the provider claims incorrectly, then, of course, the state was in a position to knowingly submit a claim for FFP. And, you know, while it may be that in some circumstances a provider or someone could cause the state to submit a false claim for FFP, that's not the allegation here. The allegation here is that the state knowingly paid the claim. So in that sense, it's not at all like the Feldman case that Relators Council alluded to. In the Feldman case, the city had been delegated a specific function by the state to make eligibility determinations for certain categories of services. And the allegation there was that the city had created incorrect or false eligibility lists and provided those to the state Medicaid program, and then the state, relying on that false eligibility list, paid the claims to the providers and then was, you know, caused to submit a false claim for FFP to the federal government. That's not the allegation here. The allegation here is that the state knowingly agreed to pay the providers and then knowingly submitted a claim for FFP. The state was not, according to the federal government, obligated to pay FFP to the providers. And that's not the allegation here. The allegation here is that the state was not obligated to pay FFP to the providers. And that's not the allegation here. There are no allegations that there was any actual agreement, no allegations as to what anyone from the city actually said, who those people were. And again, the allegation is that the state made those payments to providers knowingly, and so even if it were true that the city had encouraged the state to pay claims improperly, the state then is in a position to decide whether it can now claim federal Medicaid matching funds for that expenditure. And when I say improperly, I say because of the existence of an edit code. Maybe the state decided to pay the claim because the edit had been applied incorrectly or because the claim process, you know, sometimes edits are applied incorrectly and a provider may challenge the denial. And there are no allegations around this. There's just an assumption that if there's an edit applied at some point during the claim process, it must be an incorrect claim, and therefore it must be false. But they're just that's entirely conclusory and not supported by any, you know, correct, Your Honor. It's the state that pays the claim. Notwithstanding what Mr. Isaac said, the city does not receive or pay claims. The state, the e-medny is the state's claims processing system that the state controls. And so the state assigns the edit code. A provider can object to the application of an edit code to a claim and or fix whatever the problem might be and then resubmit the claim, and it might get paid. It's that chronology that is lacking from this complaint as to whether any of that happened. The allegation is there was an edit code, and X amount was paid for these exemplar claims, but that's really not enough to, you know, that's not a specific. Those aren't specific facts that lead to a strong inference that fraud was committed. Thank you. I think we have the argument. We have Mr. Isaac on rebuttal. You have three minutes. Thank you, Your Honor. Your Honor, you had asked me questions relative to the documents on the back of the complaint. I just wanted to point out to you, and I wanted to give you the page references to try to make your lives easier because you have cases, 67 to 94, and then 95 to 112. Those are not potential claims. Those are not possible claims. Those are paid claims. Those are claims that were actually paid. There isn't a word anywhere that any of these claims were somehow resolved based upon an edit. I would ask you to look at the paragraphs 91 to 102 of the record, of the edit code of the complaint, that's pages 36 to 40, dealing with the actual allegations that were made based upon what Mr. Geldman heard. Yes, my adversary says that Mr. Geldman did not identify city employees by name. If you look in the complaint, the reason is because most of the time they appeared by conference call. And this is not. And what does the complaint say about the city's actions with respect to each of those paid claims? There was essentially a plan in place to ensure that these Medicaid claims. No, but with respect to these particular claims, there's nothing. You're saying there's an overarching plan or conspiracy, and then these are several examples of claims that had edit codes. Correct. And that the city and the State knew exactly that these claims were potentially not subject to being paid. Again, you know, the ---- But was the Federal Government in a position to waive? I mean, timeliness is something, for example, that can be waived, right? I agree 100 percent, and maybe they would, but maybe they wouldn't. Here's the nightmare scenario. I was taught when I first started practicing appellate law a million years ago that there's a fundamental difference between judges and lawyers. Lawyers are ---- they use microanalysis. They push the position of their client, but judges have a higher responsibility. They have a macro view of everything. They have to figure out what their decision is going to do and how it's going to affect the system. Here's my nightmare scenario. Let's say that I lose 3-0 here. Seven years later, someone actually does an investigation and turns out that everything that the relator said is absolutely true. My position is that not that if you reverse, give me a deposition. If all of the possibilities, because that's what my adversary spoke to me, he said possible, this is possible, that's possible, it's all true. Let me find out. I don't have a case. But don't throw me out at the pleading stage with allegations like this dealing not with small amounts of money. I just added them up, billions of dollars over a 10-year period. That's just not right. It's not fair. And it's not what the action was designed to do, what the Chi 10 action and the False Claim Act case was designed to avoid. Thank you very much. Go ahead. The nightmare scenario that you lay out is one that doesn't apply just to this case. It applies to any case. And, I mean, what you say would have ---- would have commanded much firmer ground, would have been on much firmer ground before the Supreme Court's cases that imposed these requirements for pleading. I mean, it's always true that people bring a case and plead the complaint before they have all the facts. They need discovery. And the Supreme Court said, tough luck. You've got to have enough at least at the complaint stage to pass the tests of these cases. May I respond? Just give me a point. That's 100 percent correct. But I'm also asking you to factor in the documents I have, the specificity of the allegations, and the actual claims based on firsthand knowledge. That's not in the other cases. You're going to tell me whether I do or not. Thank you. All right. Thank you very much. We'll take the matter under advisement. We have one more case on the calendar today, but we're going to take a brief break before we hear argument in that case.